**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

FLOW MOTION RESEARCH AND DEVELOPMENT LTD.,

Plaintiff,

- against -

PELOTON INTERACTIVE, INC.,

Defendant.

Case No. 2:26-cv-610-JRG

**JURY TRIAL DEMANDED**

**DEFENDANT PELOTON INTERACTIVE, INC.'S**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ....................................................................1

II. STATEMENT OF ISSUES TO BE DECIDED ....................................................................1

III. BACKGROUND ....................................................................1

IV. ARGUMENT ....................................................................8

A. Claim 2 of the '520 Patent Fails *Alice* Steps One and Two ....................................................................8

1. *Alice* step one: Claim 2 is directed to the abstract idea of gathering data about a user's movements, processing and analyzing that data, and providing results. ....................................................................8

2. *Alice* step two: Claim 2 does not add an inventive concept. ....................................................................14

B. Claim 2 of the '520 Patent is Representative of All Other Claims ....................................................................17

C. Claim Construction is Not Necessary to Resolve Patent-Ineligibility ....................................................................20

V. NO PRE-SUIT WILLFUL INFRINGEMENT OR INDIRECT INFRINGEMENT ........21

VI. CONCLUSION ....................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
97 F.4th 1371 (Fed. Cir. 2024) ....9

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014).... *passim*

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016)....20

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016)....14

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
113 F.4th 1359 (Fed. Cir. 2024) ....11, 19

*BSG Tech LLC v. BuySeasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018)....8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)....18

*Dialect, LLC v. Bank of Am., N.A.*,
2024 WL 4980794 (E.D. Tex. Dec. 4, 2024)....21, 22

*Geoscope Techs. Pte. Ltd. v. Google LLC*,
692 F. Supp. 3d 566 (E.D. Va. 2023) ....16

*iLife Techs., Inc. v. Nintendo of Am., Inc.*,
839 F. App'x 534 (Fed. Cir. 2021) ....9, 14, 15

*Lightning Fitness Sys. LLC v. Precor Inc.*,
2025 WL 662082 (D. Del. Feb. 28, 2025)....9, 13

*Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*,
2021 WL 4206175 (E.D. Tex. Sep. 15, 2021) ....13

*Recentive Analytics, Inc. v. Fox Corp.*,
134 F.4th 1205 (Fed. Cir. 2025) ....19

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
65 F.4th 698 (Fed. Cir. 2023) ....21

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*SAP Am. Inc. v. Investpic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018)....................8

*Signode Indus. Grp. LLC v. Samuel, Son & Co., Ltd.*,
2024 WL 3543408 (E.D. Tex. July 25, 2024)....................21

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023)....................21

*Ubisoft Entm't, S.A. v. Yousician Oy*,
814 F. App'x 588 (Fed. Cir. 2020).................... *passim*

*United Servs. Auto. Ass'n v. PNC Bank N.A.*,
139 F.4th 1332 (Fed. Cir. 2025)....................9

*Wyo. Intell. Prop. Holdings LLC v. Trackman Inc.*,
2024 WL 4708061 (D. Ariz. Nov. 6, 2024)....................13, 15, 16

**STATUTES**

35 U.S.C. § 101....................1, 20, 21

**OTHER AUTHORITIES**

L.R. 12(b)(6)....................1

## I. INTRODUCTION

Plaintiff Flow Motion Research and Development Ltd. ("Flow Motion" or "Plaintiff") asserts three patents that, on their face, claim ineligible subject matter under 35 U.S.C. § 101. The claims of the asserted patents do nothing more than recite what a personal trainer does and has always done: watch a client exercise, assess whether the client's movements match the routine, and tell the client how to correct his or her form. And performing that age-old practice with generic, conventional sensors and computers cannot make the claims patent eligible.

Flow Motion also asserts claims for pre-suit willful infringement and indirect infringement but does not allege that Peloton Interactive, Inc. ("Peloton") had knowledge of the asserted patents before Flow Motion filed its complaint. These claims require dismissal under Rule 12(b)(6).

## II. STATEMENT OF ISSUES TO BE DECIDED

1. Whether the claims of the asserted patents are ineligible under 35 U.S.C. § 101, where such claims are directed to the abstract idea of gathering data about a user's movements, processing and analyzing that data, and providing results from that processing and analysis, and the patents disclose no inventive concept that would transform the abstract idea into a patent-eligible invention.

2. Whether Flow Motion has plausibly pleaded pre-suit willfulness and indirect infringement when it has not alleged, and cannot allege, pre-suit notice of the asserted patents.

## III. BACKGROUND

Flow Motion filed its original complaint on July 24, 2026 (Dkt. 1) and filed its first amended complaint on October 5, 2026 (Dkt. 24 ("FAC")). The amended complaint alleges that Peloton infringes four claims of three patents: claims 1 and 16 of U.S. Patent Nos. 9,987,520 ("'520 Patent"), claim 1 of 11,745,055 ("'055 Patent"), and claim 1 of 12,157,035 ("'035 Patent")

(collectively, the "asserted patents"). The '520, '055, and '035 Patents are related: the '035 Patent is a continuation of the '055 Patent, which is itself a continuation of the '520 Patent. These patents share the same specification and are all titled "Method and System for Monitoring and Feed-Backing on Execution of Physical Exercise Routines."

The asserted patents generally relate to motion tracking and exercise monitoring, using "motion and position sensors" that generate a "skeletal model," then compare that model to stored information about a routine. (FAC at ¶¶ 46 ('520 Patent), 79 ('055 Patent), 100 ('035 Patent); *id.*, ¶ 20.) But the named inventors did not purport to have invented sensors for tracking and monitoring human users. Nor did the named inventors purport to have invented the generation of skeletal models. The shared specification admits that already-existing systems used "motion and position sensors [to] identify and track the position and movements" of a user. (Dkt. 24-1 ("'520 Patent") at 1:29-31.) And the shared specification further admits that such "[c]onventional motion and position sensors . . . generate an output in a form of a 'skeletal model.'" (*Id.*, 1:37-39.) For example, "game consoles," such as the Microsoft XBOX 360, used the "Kinect®" sensor systems "for tracking a game player playing an electronic game" and examples of skeletal models can be found in previously published patent applications, such as US Patent Application Publication 2010/0197399. (*Id.*, 1:23-28, 1:44-47.)

The supposed shortcoming of these conventional sensor systems for tracking and modeling user movement was that they did "not provide any means for identifying a motion routine performed by a user and d[id] not provide feedback with regard to the execution of such a routine." (*Id.*, 1:51-53.) As alleged in the amended complaint, the lead named inventor, Arie Shavit, discovered this need "while attending Pilates class." (FAC at ¶ 6.) Based on "his observations of the class instruction," Mr. Shavit allegedly recognized the need for attendees of such classes "to

receive real-time feedback regarding their physical form to perform the routines correctly and reduce the risk of injury," and "further observed the difficulty the instructor faced" in tracking each participant's performance and adjusting for each trainee's level. (*Id.*, ¶ 7.)

The invention thus attempts to solve the problem Mr. Shavit observed in his Pilates class "by improving the methods and systems for providing accurate, real-time feedback during exercise routines." (*Id.*) At its core, the invention is a virtual personal trainer with conventional hardware substituting for the trainer's eyes and judgment. More specifically, the invention provides a "training module 220," which "performs the tasks related to identifying the physical exercise routine performed by the user 240, monitoring the user's 240 performance with regard to the executed routine, and providing a feedback to the user as to how to improve the execution of the routine." ('520 Patent at 4:20-25; *see also id.*, 4:41-46 (describing that training module 220 "examines the position of a user and the position of a user's 240 movements by tracking body parts during various stages of the execution of the exercise routine, tracks the rate of movements, and counts the number of routine repetitions").) The invention, including training module 220, is depicted in the diagram shown in Figure 2 below.




FIG. 2

*Id.*, Fig. 2. As shown in Figure 2, the invention includes motion and position sensors (labeled

210), as well as a database (labeled 250). (*Id.*, 3:26-32.) The sensors generate "sensory information" regarding the position and movements of the user performing a physical exercise routine (*id.*, 2:9-15; 3:49-55), and the database includes the physical exercise routines, including "[t]he saved body poses and/or positions [that] can define a physical exercise routine and enable identification of it and/or monitoring of it" (*id.*, 5:3-19). The "training module" (labeled 220) then "compare[s] the generated sensory information" from the sensors (210), to information in the database (250) that represents the "optimal execution of the physical exercise routine." (*Id.*, 2:14-17.) Through this comparison, the training module detects dissimilarities between the user's movements and the optimal exercise routine, then provides "feedback to the user as to how to improve the execution of the routine." (*Id.*, 4:20-25; *see also id.*, 2:9-24.) The patent explains that the feedback from the invention "may include increasing the speed, performing a certain motion in a different way, and so on." (*Id.*,4:25-27.) The training module 220 thus "acts as a virtual couch [sic] or trainer where physical exercise routines are presented to the user 240, and their executions are monitored," and further "suggests corrections to the user's 240 movements and/or provides additional physical exercise routines as the user 240 advances in skill." (*Id.*, 4:24-40.)

The specification does not describe any new sensor or any new technology for generating skeletal models. To the contrary, it concedes that motion and position sensors that generate skeletal models were "conventional." (*Id.*, 1:37-39.) And the "training module" that processes information from the sensors is described in purely functional terms. (*See id.*, 3:59-5:2.) For example, the specification describes that "the training module 220 performs the tasks related to identifying the physical exercise routine performed by the user 240, monitoring the user's 240 performance with regard to the executed routine, and providing a feedback to the user as to how to improve the execution of the routine" (*id.*, 4:20-25), that "the processing tasks performed by the

training module 220 are carried by a server in the Web or a cloud server" (*id.*, 4:3-5), and that the module "includes a processing unit coupled to a memory (both are not shown) that includes executable code to perform one or more of the tasks described herein" (*id.,* 4:65-5:2). But the specification provides no "executable code" for carrying out the claimed tasks, nor does it describe any particular way of or improvement for programming or designing the training module 220. The only disclosure for generating skeletal models in a manner that uses the exercise device image is through generic calibration, mathematical or comparison processes, such as by simply "comparing a calibration image to a real-time image." (*Id.,* 14:46-47.) That process may use "image comparison algorithms discussed in the related art" and "[t]ransformation or any other technique discussed in the related art." (*Id.,* 14:17-19, 42-43.)[1]

Representative claims 1 and 2 of the '520 Patent are shown below. As shown in the bolded limitations below, the claims are directed to the idea of collecting sensory data, generating a skeletal model from the sensory data, then having a black-box "training module" compare that skeletal model to stored exercise routine information, in order to identify differences and provide feedback to the user based on those differences. The claims do not recite how the sensors, generation of the skeletal model, or the training module are implemented with any specificity. This is consistent with the parlance of Plaintiff, which describes claim 1 of the '520 Patent as a "system that uses motion and position sensors, routine information representing at least one frame of an exercise routine, a training module configured to track user movement on an exercise device, use of the appearance of the exercise device, the appearance of a feature of the device, or a machine-representation model of the device, and processing of sensory information for separation,

[1] The specification also describes that obtaining reference points for separation from the user image can simply be "input by the user, for example, by marking on the point sensors' 1040 output image or inputting the point's coordinates." ('520 Patent at 14:20-22.)

calibration and/or adjustment, or assistance in generating a skeletal model of the user. Claim 1 further recites generating a skeletal model from sensory information and comparing that generated skeletal model to routine information stored in a database to detect dissimilarities indicating incorrect execution of the exercise routine." (FAC at ¶ 46.)

| ’520, Claim 1 | |
|---|---|
| 1(preamble) | 1. A system for monitoring performance of an exercise routine, comprising: |
| 1(a) | a computing device; |
| 1(b) | ***a plurality of motion and position sensors configured to generate sensory information*** related to at least one movement of a user performing the exercise routine; |
| 1(c) | a database containing routine information representing at least one frame of exercise routine; |
| 1(d) | ***a training module*** configured to: track at least one movement of a user performing the exercise routine on an exercise device;<br>use at least one of: appearance of the exercise device, appearance of a feature of it, or machine representation model of thereof; |
| 1(e) | for at least one of: separate from the sensory information at least appearance of the exercise device or a feature of it, calibration and/or adjustment of the said generated sensory information, assistance in the generation of skeletal model of the user from the sensory information; |
| 1(f) | ***generate at least a skeletal model of the user from the sensory information***; |
| 1(g) | ***compare the generated skeletal model generated from the sensory information to routine information stored in a database to detect at least dissimilarities*** between the skeletal model generated from the sensory information and the routine information, ***wherein the dissimilarities indicate incorrect execution of the exercise routine***, wherein the routine information represents at least an optimal execution of the exercise routine. |
| ’520, Claim 2 | |
| (2) | 2. The system of claim **1,** wherein the training module is further configured to ***provide feedback on at least one movement of a user performing the exercise routine*** where the feedback is provided by at least one of: a sound generating device, a speech generating device, a display, a touch screen, a mobile device. |

The specification admits that the claimed elements consist of generic, conventional

hardware operating in a routine, conventional manner. The specification acknowledges that "conventional motion and position sensors utilized in game consoles generate an output in a form of a 'skeletal model,'" which is simply defined as a "collection of joints 110 and lines 120 representing the body bones connected" and "coordinates describing the location of the joints and connected lines of a human body's bones." ('520 Patent at 1:37-44.) The training module processing the sensory information to generate a skeletal model can be realized on a generic all-purpose computer, such as "a laptop computer, a personal computer, a tablet computer, a smart phone, and the like" or a generic "processing unit coupled to a memory." (*Id.,* 4:1-3, 4:65-5:1.) The specification acknowledges that the software is "executed by[] a machine comprising any suitable architecture." (*Id.,* 16:29-33.) Similarly, the memory can be "any form or non-transitory readable medium." (*Id.,* 5:1-2.) The specification adds that feedback is provided to the user through any one of numerous ordinary communication channels, including print, display, audio, email, or SMS. (*Id.,* 13:38-40.)

The '055 Patent and the '035 Patent are substantively the same as the '520 Patent. The independent claims of the '055 Patent recite the same core system—i.e., motion and position sensors, a database containing routine information, and a training module, which are used to track exercise and monitor performance—but use the term "machine representation model" in place of, as an alternative to, or in addition to "skeletal model." Likewise, the independent claims of the '035 Patent recite the same core system components—again, sensors, a database, and a training module—but use the same "machine representation model" language as the '055 Patent and broaden the sensor language to include "at least one of motion sensor and/or at least one of position sensor," rather than "a plurality."

## IV. ARGUMENT

For the reasons discussed below, the claims of the asserted patents cannot survive *Alice* step one or two, and therefore should be held ineligible. Additionally, Flow Motion fails to plead pre-suit knowledge of the asserted patents, and therefore its claims of pre-suit willfulness and indirect infringement should be dismissed.

### A. Claim 2 of the ’520 Patent Fails *Alice* Steps One and Two

Peloton’s analysis below focuses on claims 1 and 2 of the ’520 Patent. Claim 2 depends from, and therefore incorporates every limitation of, asserted claim 1 of the ’520 Patent. While Flow Motion does not expressly assert claim 2 of the ’520 Patent, Flow Motion consistently describes the claims and its claimed invention as “providing feedback”—a claim requirement that is in claim 2, not claim 1.[2] (*See* FAC at, e.g., ¶¶ 45, 48; *see also* ’520 Patent, Claims 1-2.) As explained below, all other claims of the asserted patents, including the remaining asserted claims, are directed to the same abstract idea, and contain no inventive concept. (*See infra* Sections IV.B–C.) All claims are thus patent-ineligible.

#### 1. <u>*Alice* step one: Claim 2 is directed to the abstract idea of gathering data about a user’s movements, processing and analyzing that data, and providing results.</u>

At *Alice* step one, the inquiry is whether the asserted patent claims are directed to an abstract idea. This analysis requires the Court to examine the “focus of the claims” or their “character as a whole.” *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018); *SAP Am. Inc. v. Investpic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (citing cases). The Federal Circuit has repeatedly made clear that gathering data about a user’s actions, processing and analyzing it, and providing information based on that analysis, is an abstract idea. *Ubisoft Entm’t,*

---

[2] Flow Motion expressly asserts four claims in this action: claim 1 of each of the asserted patents, and claim 16 of the ’520 Patent. (FAC at ¶¶ 53, 83, 104.)

*S.A. v. Yousician Oy*, 814 F. App'x 588, 591–92 (Fed. Cir. 2020); *see also iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 F. App'x 534, 536–37 (Fed. Cir. 2021) (finding claims reciting motion sensor system that evaluates and communicates relative movement of body using information collected from sensors is abstract idea); *Lightning Fitness Sys. LLC v. Precor Inc.*, 2025 WL 662082, at *5–6 (D. Del. Feb. 28, 2025) (finding claims directed to processors receiving information, analyzing information against set points, and either providing feedback to user or controlling movement device based on analysis is automation of human activity using computer and abstract idea); *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024) ("We have explained that the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract components."); *United Servs. Auto. Ass'n v. PNC Bank N.A.*, 139 F.4th 1332, 1337 (Fed. Cir. 2025) ("We have previously held that claims directed to collecting information, analyzing information by 'steps people go through in their minds, or by mathematical algorithms, without more,' and presenting the results of collecting and analyzing information fall 'within the realm of abstract ideas.'") (citation omitted), *cert. denied*, 146 S. Ct. 2665 (2026).

Here, the claims of the asserted patents are directed to the mental activity performed by a personal trainer: gathering data about a user's movements, processing and analyzing that data, and providing results from that processing and analysis. Claim 1 of the '520 Patent requires "motion and position sensors configured to generate sensory information" and a training module that "track[s] at least one movement of a user performing the exercise routine on an exercise device" (i.e., *gathering data about a user's movements*); using information about the appearance of the exercise device "for at least one of: separate from the sensory information at least appearance of the exercise device or a feature of it, calibration and/or adjustment of the said generated sensory

information, assistance in the generation of skeletal model of the user from the sensory information" and "generat[ing] at least a skeletal model of the user from the sensory information" (i.e., *processing data*); and "compar[ing] the generated skeletal model generated from the sensory information to routine information stored in a database to detect at least dissimilarities" (i.e., *analyzing data*). ('520 Patent, Claim 1.) Claim 2, which depends from claim 1, adds that the claimed training module is further configured to "provide feedback on at least one movement of a user performing the exercise routine" (i.e., *providing results from the processing and analysis of data*). ('520 Patent, Claim 2). In total, the claims are nothing more than an attempt to automate what Mr. Shavit watched his instructor do in his Pilates class.

The Federal Circuit's opinion in *Ubisoft* is instructive. *Ubisoft*, 814 F. App'x 588. There, the patent was directed to a computer game designed for learning to play guitar. *Id.,* 589. The claims related to (i) presenting "fingering notations corresponding to the song to be played by a user"; (ii) receiving input, specifically "an analog or digital audio signal when the guitar is played by the user"; (iii) "assessing a performance of the songs played by the user"; (iv) "determining a portion of the performance that should be improved"; and (v) "based on the assessed performance and the determined portion of the performance that should be improved, selectively changing a difficulty level" and "generating at least one mini-game" targeted to improve the user's skills based on the determined portion. *Id.,* 589–90; *see also id.,* 591 (the patent "claim[s] an abstract process in five steps" and identifies the five steps). The Federal Circuit affirmed the district court's decision, explaining that "the claims recite nothing more than a process of gathering, analyzing, and displaying certain results" and are therefore abstract. *Id.,* 591. The Federal Circuit further rejected the patentee's argument that the claims recited a "specific asserted improvement in computer capabilities," finding that the claims "do not recite a particular way of program[m]ing

or designing software" and that the claimed five-step process is described only "in functional terms and not by what process or machinery is required to achieve those functions." *Id.* The Federal Circuit analogized the concept of "assess[ing] the user's past performance and provid[ing] the user with exercises or games to target the areas" of improvement as being "no different from the ordinary mental processes of a guitar instructor teaching a student how to play the guitar." *Id.,* 592.

Like the claims in *Ubisoft*, claims 1 and 2 of the '520 Patent recite the same abstract process of gathering data about a user's physical performance, processing and analyzing that data, and providing results based on that analysis. In *Ubisoft*, the claims included, *inter alia*, receiving input from the user's actions (audio signals from playing guitar), assessing the user's performance to determine areas for improvement, and providing feedback based on that assessment (adjusting difficulty and generating targeted exercises). *Id.,* 590–91. Here, claims 1 and 2 similarly recite receiving input from the user's actions (i.e., through motion and position sensors that generate sensory information); assessing the user's actions (i.e., by generating a skeletal model, then comparing the skeletal model to stored routine information to detect dissimilarities); and providing feedback on the user's movements based on that analysis. ('520 Patent, Claims 1-2.) Just as the Federal Circuit held that the *Ubisoft* claims recited "nothing more than a process of gathering, analyzing, and displaying certain results," *Ubisoft*, 814 F. App'x at 591, claims 1 and 2 of the '520 Patent recite nothing more than gathering sensory data about a user's exercise movements, processing and analyzing that data, and providing feedback—the same abstract concept.[3]

---

[3] To the extent that Flow Motion contends that claim 2 combines multiple abstract ideas, e.g., (i) collection and analysis of data and (ii) feedback based on that analysis, claim 2 still does not survive *Alice* step one. The Federal Circuit has made clear that the combination of abstract ideas does not render a claim any less abstract. *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1924 (2025).

Nor do the asserted patents claim any improvement to the functioning of a computer or any other technology. The *Ubisoft* court found relevant that the patents there did "not recite a particular way of program[m]ing or designing software" and that the claimed process was described only "in functional terms and not by what process or machinery is required to achieve those functions." *Id.,* 591. The same is true here. The "training module" that processes sensory information to generate a skeletal model is defined entirely in functional terms. (*See* '520 Patent at 17:3-15; *see also id.*, 3:59-5:2.) The specification does not describe any technological improvement in the training module, nor does it describe any new sensor, any new technology for generating skeletal models, or any particular way of programming or designing the training module to process sensory information to generate skeletal models. To the contrary, the specification admits that the motion and position sensors and the skeletal model outputs they generate were already conventional—the same sensors and outputs used in the Microsoft XBOX 360 Kinect® system for gaming. ('520 Patent at 1:23-39.) And the specification further admits that generating skeletal models by separating a user image from an exercise device image can simply be done by "comparing a calibration image to a real-time image" ('520 Patent at 14:46-47) or otherwise using algorithms and techniques "discussed in the related art" (*id.,* 14:1-43). The only asserted "shortcoming" of these existing systems was that they were not being used to monitor exercise routines and provide corrective feedback. (*Id.,* 1:51-53.) But applying an already-known concept—sensor-based motion tracking and skeletal modeling—to an allegedly new field of use, i.e., exercise monitoring, does not render the claims any less abstract, particularly when carried out using merely conventional and functionally-defined components.

Finally, just as the *Ubisoft* court found that the claimed process was "no different from the ordinary mental processes of a guitar instructor teaching a student how to play the guitar," 814 F.

App'x at 592, the process claimed here is no different from the ordinary mental processes of a personal trainer observing a client performing an exercise, comparing the client's form to the correct technique, and providing corrective feedback. Indeed, the specification of the asserted patents explains that the claimed training module of the invention simply "acts as a virtual couch [sic] or trainer where physical exercise routines are presented to the user 240, and their executions are monitored," and further "suggests corrections to the user's 240 movements and/or provides additional physical exercise routines as the user 240 advances in skill." ('520 Patent at 4:24-40.) As this Court has recognized, the concept of providing instruction for exercise is an abstract idea. *Mad Dogg Athletics, Inc. v. Peloton Interactive, Inc.*, 2021 WL 4206175, at *5 (E.D. Tex. Sep. 15, 2021) ("The claim language supports a conclusion that the claims are directed to an abstract idea—providing instruction for an exercise bike class.").[4] The substitution of sensors and skeletal models for a trainer's eyes and judgment does not transform this abstract concept into a patent-eligible invention.

In total, claims 1 and 2 are nothing more than claims directed to gathering data, processing and analyzing that data, and providing results, and are thus abstract. This process is nothing more than the age-old mental activity performed by a personal trainer. Claims 1 and 2 cannot survive *Alice* step one.

[4] Numerous other courts have similarly found claims directed to feedback to be abstract. *See, e.g., Ubisoft*, 814 F. App'x at 591–92 (finding claims providing user exercises to target areas needing improvement is no different from ordinary mental processes of guitar instructor teaching student how to play guitar); *see also Wyo. Intell. Prop. Holdings LLC v. Trackman Inc.*, 2024 WL 4708061, at *4 (D. Ariz. Nov. 6, 2024) (finding claim directed to teaching user how to do something by evaluating performance and generating instructions to improve is quintessential human cognitive action and abstract); *Lightning Fitness*, 2025 WL 662082, at *6 (D. Del. Feb. 28, 2025) (acknowledging coaches may provide verbal feedback to client or adjust settings on treadmill in response to client's heavy breathing or sweat).

2. *Alice* step two: Claim 2 does not add an inventive concept.

Since claim 2, which incorporates claim 1, is directed to an abstract idea, it is ineligible unless it adds an "inventive concept" that is sufficient to ensure that the patent amounts to significantly more than the ineligible concept itself. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014). Neither generic computer technology, nor "well-understood, routine, conventional" components, nor "purely functional" elements, can supply an inventive concept. *Id.,* 221–26. To provide an inventive concept, the claims must contain a "technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way)." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016).

None of the limitations in the representative claims of the '520 Patent is inventive. The claims are directed to mere mental activity of a personal trainer, and that process is carried out entirely by conventional equipment and purely functional components: "motion and position sensors," a "database" and a "training module," and claim 2 recites providing feedback by at least one of "a sound generating device, a speech generating device, a display, a touch screen, [or] a mobile device." ('520 Patent, Claims 1-2.) The claims provide no detail about these components. And the specification concedes that these components are entirely conventional. The background of the patent specification explains that "motion and position sensors" were already used to "identify and track the position and movements of a player" and used to generate a "skeletal model" of a human user. (*Id.,* 1:29-39.)

*iLife Technologies, Inc. v. Nintendo of America, Inc.* is instructive. The Federal Circuit found ineligible claims that added only admittedly known sensors, similar to those claimed here ('520 Patent Claim 1, element 1(b)). *iLife*, 839 F. App'x at 537. The patentee argued that configuring "an acceleration-based sensor and processor to detect and distinguish body

movement" was inventive, but the specification acknowledged that sensors measuring static and dynamic acceleration "[were] known." *Id.,* 538. The court held that the claim's "mere call for sensing and processing . . . information using generic components does not transform the nature of claim 1 into patent eligible subject matter." *Id.* Like in *iLife*, the claims here merely recite the use of generic sensors, used in a completely conventional way. ('520 Patent Claim 1, element 1(b).) The sensors generate data about a user's physical performance, which is then processed in some black-box manner to create a skeletal model or other representation of the user. Such conventional use of sensors to collect data, process that data, and create a model or representation of the object of the sensors, is merely conventional and thus cannot constitute an inventive concept. *See iLife*, 839 F. App'x at 538 (finding no inventive concept where claims only add generic components, including sensor, processor, and communication device); *see also Alice*, 573 U.S. at 223; *Wyo. Intell. Prop. Holdings*, 2024 WL 4708061, at *5 (finding sensor encompassing "seemingly limitless array of data-collecting components" was generic).

Other conventional equipment recited in the claims fares no better. The claims require a "database" ('520 Patent Claim 1, element 1(c)), but the specification provides no indication of any particular technology or novelty of the "database"—instead merely stating that it "may be integrated in, or externally connected to the [] training module 220." (*Id.,* 5:3-4.) The "display" can be any one of an open-ended laundry list of off-the-shelf display hardware: "a flat screen TV, a projector, a monitor, a touch screen, and the like." (*Id.,* 3:56-58.)

And the claimed "training module" ('520 Patent Claim 1, elements 1(d), 1(e) and Claim 2) is described in the specification as a module that can be realized on any generic computer, such as "a laptop computer, a personal computer, a tablet computer, a smart phone, and the like," or "any portable device that includes or does not include a display." (*Id.,* 4:1-3, 4:10-13.) The training

module is simply a generic "processing unit coupled to a memory . . . that includes executable code to perform one or more tasks described herein"—but the specification provides no identification of any code that performs the described tasks. (*Id.,* 4:65-5:1.) The software is simply "executed by[] a machine comprising any suitable architecture," and any memory may be "any form or non-transitory readable medium." (*Id.,* 5:1-2, 16:29-33.) Those are textbook admissions of conventionality.[5]

To the extent Flow Motion argues that an inventive concept exists in the "use of the appearance of the exercise device" to calibrate or adjust the sensory information, to separate the sensory information from the appearance of the exercise device or a feature of it, or otherwise assist in the generation of skeletal model (*see* FAC at ¶ 46), that argument should be rejected. This is merely assisting in processing sensory data, and such processing of data, including any "calibration" or "adjustment" of sensory data, is abstract. *See Geoscope Techs. Pte. Ltd. v. Google LLC*, 692 F. Supp. 3d 566, 575–76 (E.D. Va. 2023) (finding claims that analyze data by comparing them to calibration data to be patent ineligible), *aff'd*, 2025 WL 1276235 (Fed. Cir. May 2, 2025).

Moreover, the only component that purportedly uses the appearance of the exercise device is the "training module," which, again, is nothing more than a functionally defined, black-box component. There is no disclosure in the claims, or in the specification, about any technological improvement provided by the training module. Nor do the claims even require a particular method of processing that uses the appearance of the exercise device; instead, the claims broadly cover

[5] The remainder of the claim elements in claim 1 are simply "a computing device" (element 1(a)), and steps performed by the claimed system, specifically generating the skeletal model and comparing the skeletal model to routine information stored in the database (elements 1(f), 1(g)). The remainder of the elements in claim 2, which are disclosed as the components providing feedback, are likewise generic or functionally defined computer components: "sound generating device, a speech generating device, a display, a touch screen, a mobile device" (claim 2).

any use of the appearance or representation of an exercise device for "assistance in the generation of skeletal model of the user from the sensory information."[6] Furthermore, to the extent Flow Motion claims an inventive concept specifically in "calibration," that is merely a generic technique for removing irrelevant data so that the remaining data can be analyzed: a scientist zeroes out a scale before weighing a sample, a police officer calibrates a radar gun using a tuning fork that simulates a specific speed, and a machinist calibrates his calipers by measuring them against a gage block of certified length. The shared specification admits that this is simply "comparing a calibration image to a real-time image" ('520 Patent at 14:46-47), and the process may use "algorithms" already "discussed in the related art" and "[t]ransformation or any other technique discussed in the related art" (*id.,* 14:17-19, 42-43). The same abstract process underlying this calibration or comparison process occurs when a human personal trainer isolates a trainee from an exercise apparatus, such as a Pilates reformer or a rowing machine. Before assessing the trainee's form, the trainer must mentally disregard the frame, seat, and handle of the apparatus to observe the trainee's own posture and joint angles. Claim 1 merely performs that mental exercise by analyzing sensory information to remove the exercise device.

### B. Claim 2 of the '520 Patent is Representative of All Other Claims

Claim 2 of the '520 Patent is representative of every other claim of the asserted patents. Claim 2 of the '520 Patent incorporates claim 1, which parallels claim 1 of the '055 and '035 Patents. Courts need not individually address all claims where "the claims of the asserted patents are substantially similar in that they recite little more than the same abstract idea" and one claim

---

[6] The claim requires use of the appearance or representation of an exercise device "for ***at least one of***: separate from the sensory information at least appearance of the exercise device or a feature of it, calibration and/or adjustment of the said generated sensory information, ***assistance in the generation of skeletal model of the user from the sensory information***." ('520 Patent, Claim 1 (emphasis added).)

is representative. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Claims with additional limitations that are "well-known, routine, and conventional functions" are not distinguishable from the representative claim for purposes of the *Alice* test. *Id.,* 1349. Nothing in the other claims of the asserted patents renders them patent eligible: each is directed to the same abstract idea as claims 1 and 2 of the '520 Patent and adds only conventional elements. All of the claims therefore fall on the same grounds.

The claims of each of the '055 and '035 Patents, which Flow Motion identifies in the amended complaint as addressing the same technical improvements as claim 1 of the '520 Patent (FAC at ¶ 31), fare no better. These claims are directed to the same abstract features of claims 1 and 2 of the '520 Patent. For example, claim 3 of the '055 Patent, which depends from asserted claim 1 and claim 2 of the '055 Patent, claims: (1) use of sensors for tracking the movement of a user (i.e., elements (b) and (d) of claim 1 of the '520 Patent), (2) processing the data against a reference point (i.e., elements (d) and (e) of claim 1 of the '520 Patent), (3) generating a computer representation of the user (i.e., element 1(f) of claim 1 of the '520 Patent), (4) analyzing the representation by comparing it to stored information, to identify dissimilarities (i.e., elements (c) and (g) of claim 1 of the '520 Patent,), and (5) providing feedback on the user performing the exercise routine (i.e., claim 2 of the '520 Patent). Similarly, claim 2 of the '035 Patent, which depends from asserted claim 1 of the '035 Patent, claims all of the same features other than providing feedback. The only other differences between these claims of the '055 Patent and the '035 Patent and claim 1 of the '520 Patent are that the former claims claim a "machine representation model" in place of, as an alternative to, or in addition to "skeletal model," and claim "at least one of motion sensor and/or at least one of position sensor," rather than "a plurality of

motion and position sensors." (*See supra* at 7–8.) These are non-inventive variations of the limitations in claim 1 of the '520 Patent, and do not save those claims from ineligibility.

Asserted claim 16 of the '520 Patent is likewise ineligible. Like claim 1 of the '520 Patent, claim 16 claims: (1) use of sensors for tracking the movement of a user (i.e., elements (b) and (d) of claim 1 of the '520 Patent), (2) analyzing the sensory information by comparing it to stored information, to identify dissimilarities (i.e., elements (c) and (g) of claim 1 of the '520 Patent), and (3) providing feedback on the user performing the exercise routine (i.e., claim 2 of the '520 Patent). While claim 16 adds an element of "automatically" changing the difficulty level, resistance, or tension provided by the exercise device based on feedback ('520 Patent, 18:52-55), such feature does not render the claims patent eligible. As the Federal Circuit has repeatedly explained, automation is not an inventive concept and cannot save an invention claiming an abstract idea from ineligibility. *Broadband iTV*, 113 F.4th at 1370 (finding generating displays automatically does not transform invention into more than abstract idea because automation does not constitute inventive concept); *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1215 (Fed. Cir. 2025) (finding that using machine learning to dynamically generate maps and schedules based on real-time data and update them based on changing conditions does not transform abstract idea into patent-eligible application), *cert. denied*, 146 S. Ct. 891 (2025). Indeed, a human trainer who sees a client struggling and turns down the resistance on a reformer or treadmill performs the same function.

The other claims of the asserted patents likewise add nothing inventive. They simply add conventional techniques or equipment for the same objective, such as: type of content in the feedback ('520 Patent, claims 8-9; '055 Patent, claims 4, 7; '035 Patent, claims 10, 17); type of exercise ('520 Patent, claims 5, 13; '055 Patent, claims 8, 15; '035 Patent, claims 9, 20); type of

user movement tracked ('520 Patent, claims 5, 10, 13, 19; '055 Patent, claims 8, 12-13, 15; '035 Patent, claims 9, 16, 18, 20); the location of sensors on the exercise device ('520 Patent, claim 3; '055 Patent, claim 16; '035 Patent, claim 7); the sending of sensory information over a network ('520 Patent, claims 4, 14; '055 Patent, claim 17; '035 Patent, claim 8); the implementation on a mobile device ('520 Patent, claims 8; '055 Patent, claims 3, 4, 5; '035 Patent, claims 6, 10, 11); and other conventional processing of the sensory data ('520 Patent, claims 6-7, 11-12, 15, 17-20; '055 Patent, claims 2, 6, 9-11, 14, 18-20; '035 Patent, claims 2-5, 12-19). None discloses a concrete solution that transforms the basic abstract idea into a patent-eligible invention. *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1243 (Fed. Cir. 2016) ("It is not enough to point to conventional applications and say 'do it on a computer.'") (citation omitted).

Accordingly, every claim of the asserted patents is ineligible for the same reasons as claims 1 and 2 of the '520 Patent.

**C. Claim Construction is Not Necessary to Resolve Patent-Ineligibility**

Flow Motion contends that one limitation of claim 1 of the '520 Patent requires construction.[7] That limitation is the requirement that the training module "use at least one of: appearance of the exercise device, appearance of a feature of it, or machine representation model of thereof." Flow Motion asserts that, once properly construed, this limitation makes the claimed system unconventional under *Alice* step two. (*See supra* footnote 7.)

But Flow Motion never offers a construction. It does not say what the limitation means, how its meaning differs from the plain claim language, or how any construction would change the ineligibility analysis. "A patentee must do more than invoke a generic need for claim construction or discovery to avoid grant of a motion to dismiss under § 101" and must instead "propose a

[7] Counsel for the parties discussed Flow Motion's contentions regarding whether claim construction is needed to resolve the patent-ineligibility issue during the parties' meet-and-confer.

specific claim construction or identify specific facts that need development and explain why those circumstances must be resolved before the scope of the claims can be understood for § 101 purposes." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360–61 (Fed. Cir. 2023); *see also Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 704 (Fed. Cir. 2023). Flow Motion has done neither.

In any event, the plain text of the limitation resolves the question. The limitation requires only that the training module "use" information about the exercise device, without saying how. It then lists three alternative purposes for that use: "separate from the sensory information" the device's appearance, "calibration and/or adjustment" of the sensory information, or "assistance in the generation of skeletal model of the user." Each is a result, not a means of achieving it. As explained above, using reference information to filter or adjust collected data before analyzing it is itself abstract data processing. It is also no different from a trainer mentally disregarding an exercise device's appearance to assess a client's form. The specification confirms that this processing can be done with image-comparison and transformation techniques "discussed in the related art." ('520 Patent at 14:1-43.) In sum, on any reasonable reading, the limitation neither makes claim 1 non-abstract at step one nor supplies an inventive concept at step two. The Court can and should resolve eligibility now.

## V. NO PRE-SUIT WILLFUL INFRINGEMENT OR INDIRECT INFRINGEMENT

Flow Motion fails to plausibly allege any pre-suit knowledge of the asserted patents, as required to plead pre-suit willfulness. *Dialect, LLC v. Bank of Am., N.A.*, 2024 WL 4980794, at *2 (E.D. Tex. Dec. 4, 2024); *Signode Indus. Grp. LLC v. Samuel, Son & Co., Ltd.*, 2024 WL 3543408, at *2 (E.D. Tex. July 25, 2024) ("To sufficiently plead pre-suit willful infringement, a plaintiff must plausibly allege that the defendant knew of an asserted patent before the plaintiff

filed the lawsuit.").

Flow Motion includes a boilerplate allegation that "Defendant has had knowledge of the '520 Patent at least since the filing and service of the original Complaint." (FAC at ¶ 72.) Flow Motion makes a similar boilerplate allegation for the '055 and '035 Patents.[8] (*Id.,* ¶¶ 93 ('055 Patent), 113 ('035 Patent).) But Flow Motion's complaint alleges no facts to support any such allegation. Without a plausible allegation of pre-suit knowledge, Flow Motion's pre-suit willfulness claim must be dismissed.

Flow Motion also fails to allege pre-suit induced and contributory infringement because, like pre-suit willfulness, these claims also require pre-suit knowledge of the asserted patents. *Dialect*, 2024 WL 4980794, at *2. As discussed above, Flow Motion fails to plead that Peloton had knowledge of any asserted patent prior to the filing of the complaint, and its pre-suit claim of induced and contributory infringement should also be dismissed. *Id.*

## VI. CONCLUSION

For the foregoing reasons, Peloton respectfully requests that the Court dismiss Flow Motion's amended complaint (Dkt. 24) in its entirety with prejudice for failure to state a claim.

[8] For the '055 and '035 Patents, Flow Motion also alleges Defendant had knowledge of the "infringing nature of the Accused Products" since service of the original Complaint.

Dated: October 19, 2026

Respectfully submitted,

By: */s/ Krishnan Padmanabhan*

Shaun W. Hassett
TX State Bar No. 24074372
POTTER MINTON, P.C.
102 N. College Ave., Suite 900
Tyler, TX 75702
Telephone: (903) 597-8311
Facsimile: (903) 531-3972
shaunhassett@potterminton.com

Krishnan Padmanabhan
Tessa Placa (pending *pro hac vice*)
FENWICK & WEST LLP
902 Broadway, 18th Floor
New York, NY 10010-6035
Telephone: 212.430.2600
Facsimile: 650.988.5200
kpadmanabhan@fenwick.com
tplaca@fenwick.com

Scott Border
FENWICK & WEST LLP
1155 F St NW, 12th Floor
Washington, DC 20004
Telephone: 202.970.3000
Facsimile: 650.988.5200
sborder@fenwick.com

Jessica Kaempf
Jonathan McMichael
FENWICK & WEST LLP
401 Union St, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 650.988.5200
jkaempf@fenwick.com
jmcmichael@fenwick.com

Christopher Lavin (pending *pro hac vice*)
FENWICK & WEST LLP
One Front Street, Floor 33
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.988.5200
clavin@fenwick.com

*Attorneys for Defendant*
*Peloton Interactive, Inc.*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Defendant has complied with the meet and confer requirements in L.R. CV-7(h) regarding this opposed motion. Counsel for both parties met and conferred by video conference as required on at least October 6, 2026 as well as by email in a good faith attempt to resolve these matters but were unable to reach an agreement and the matters cannot be resolved without court intervention.

*/s/ Krishnan Padmanabhan*
Krishnan Padmanabhan

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S 35 U.S.C. § 101 MOTION PRACTICE ORDER

______ The parties **agree** that prior claim construction is not needed to inform the Court's analysis as to patentability.

__X__ The parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Krishnan Padmanabhan*
Krishnan Padmanabhan

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 19, 2026 all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5.

*/s/ Krishnan Padmanabhan*
Krishnan Padmanabhan